## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

HOME ASSURE, LLC,
A Florida limited liability company,

B HOME ASSOCIATES, LLC,
a Florida limited liability company, d/b/a
B HOMES,

BRIAN BLANCHARD,
individually and as a member officer,
or director of Home Assure, LLC, and
B Home Associates, LLC,

MICHAEL GRIECO,
MICHAEL TRIMARCO, and
NICOLAS MOLINA,
individually and as members, officers, or
directors of Home Assure, LLC,

     Defendants.

_____/

CASE NO: 8:09-cv-547-T-23 TBM

---

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUCTION, AND MOTION TO DISSOLVE THE *EX PARTE* TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE AND OTHER EQUITABLE RELIEF

HOMERBONNER
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5143
Telecopier: (305) 982-0060
*Attorneys for Defendants*
*Michael Trimarco and Nicolas Molina*

# TABLE OF AUTHORITIES

## Cases

*Aaron v. Securities & Exch. Comm'n*, 446 U.S. 680 (1980) ................................................. 2

*Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974) .................................. 7

*CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71 (3d Cir. 1993) ..................................... 20

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979).................................................................. 7

*CFTC v. Wilshire Inv. Management Corp.*, 531 F.3d 1339 (11th Cir. 2008) .............................. 18

*Dunn v. CFTC*, 519 U.S. 465, 470 (1997) ................................................................... 11

*FTC v. Evans Products Co.*, 775 F. 2d. 1084 (9th Cir. 1985) ......................................... 10

*FTC v. Marketing Response Group, Inc.*, 1996 WL 420865 (M.D. Fla. 1996)............................. 10

*FTC v. Netfran Dev. Corp.*, Case No. 05-22223-CIV-Ungaro-Benages (S.D. Fla. 2006) ............. 9

*FTC v. University Health, Inc.,* 938 F.2d 1206 (11th Cir. 1991)......................................... 9

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) ................................................... 19

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70,* 415 U.S. 423 (1974).................................................................................................. 8

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ................................... 18

*Levine v. Comcoa Ltd.,* 7 F. 3d 1191 (11th Cir. 1995) ................................................... 8

*Perieira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005)................................................... 20

*S.E.C. v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978) ................................................... 8

*S.E.C. v. Unifund SAL*, 910 F.2d 1028 (2nd Cir. 1990)................................................... 7

*Sampson v. Murray,* 415 U.S. 61 (1974) ..................................................................... 8

*SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir. 1978).......................... 11

*SEC v. Wills*, 472 F. Supp. 1250 (D.D.C. 1978)........................................................... 10

i

## Statutes

15 U.S.C. § 45(a) .......................................................................................................... 12

15 U.S.C. § 53 ................................................................................................. 7, 10, 11, 18

Fla. Stat. § 501.1377 ..................................................................................................... 18

## Rules

Rule 65, Fed. R. Civ. P .................................................................................................. 8

## Treatises

Restatement (Third) of Restitution §2 ......................................................................... 20

ii

Defendants Michael Trimarco ("Trimarco") and Nicolas Molina ("Molina") (collectively "Defendants") submit this opposition to the motion for preliminary injunction filed by the Federal Trade Commission ("FTC"), and in support of their previous oral request that the Court dissolve the March 26, 2009 *ex parte* Temporary Restraining Order with Asset Freeze ("TRO"). . The FTC is not entitled to a preliminary injunction because it has not demonstrated, nor can it demonstrate, that it is likely to prevail on the merits of its complaint, and that there is some reasonable likelihood of future violations of the FTC Act by these Defendants. Further, if the Court had known the real facts rather than the skewed, inaccurate and perjury-laden version presented ex parte, we are confident the Court would have concluded a TRO against these Defendants was totally unwarranted. Accordingly the TRO should be dissolved in its entirety, lifting the vastly overbroad freeze over virtually <u>all</u> of Defendants' assets.[1]

## INTRODUCTION

"*An injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith.*" -Chief Justice Warren Burger, *Aaron v. Securities & Exch. Comm'n*, 446 U.S. 680, 703 (1980) (concurring).

### The Dispute

Home Assure was a lender assistance company that provided help to homeowners, many of whom were delinquent on their mortgages, by negotiating with their lenders to obtain loan modifications and/or repayment plans. Although Home Assure helped hundreds of homeowners achieve desired loan workouts, it was a financial failure. Indeed, Home Assure never generated

---

[1] Defendants addressed the impropriety of the all-encompassing asset freeze in their Motion for a "Nexus" Hearing, and to Modify and/or Dissolve the Asset Freeze Imposed Pursuant to the March 26, 2009 *ex parte* TRO [D.E. #23], and hereby incorporate that motion herein by reference.

1

a profit and Trimarco and Molina lost hundreds of thousands of dollars in the process. Molina and Trimarco resigned from Home Assure on September 13, 2008, and October 17, 2008, respectively. *See* Declaration of Nicolas Molina, ¶ 9, attached as Exhibit 1; Declaration of Michael Trimarco, ¶ 7, attached as Exhibit 2. Home Assure was wound down in September 2008 and ceased operations in October 2008.[2] *See* Declaration of Michael Grieco, ¶¶ 30, 31, attached as Exhibit 3.

The instant case is a textbook example of government overreaching. The FTC does not make any specific allegation of fraudulent or deceptive conduct against either Trimarco or Molina in connection with Home Assure. Instead, the FTC alleges that Home Assure and its purported successor entity B Home Associates, LLC ("B Home") supposedly "represented...that Defendants would stop consumers' foreclosures in all or virtually all instances" and that Defendants "would refund consumers' fees in all instances when foreclosure was not stopped." Pls. Compl. ¶¶ 34, 37. Based upon these allegations, the FTC seeks to impose personal liability against Trimarco and Molina for the supposed acts of Home Assure and B Home.

As a threshold matter, the FTC does not offer a scintilla of meaningful evidence supporting its claim that B Home is the purported successor of Home Assure. The best the FTC can muster is that both entities used a "similar Working Agreement," that B Home uses "at least one of the same sales representatives" and acquired the "homeassure.com domain name." Pls. TRO Memo, at p.18 [D.E. #6]. The FTC also seeks to impose successor liability because B Home allegedly used some office furniture, partitions, and computers that once belonged to Home Assure. Pls. Opp., at p.4 [D.E. #30].

---

[2] Home Assure was administratively dissolved on February 24, 2009.

2

The FTC's touted links are simply not enough to obtain injunctive relief against Trimarco and Molina, let alone personal liability. In fact, Home Assure and B Home are completely unrelated and separate entities. *See* Declaration of Brian Blanchard, ¶ 6, attached as Exhibit 4; *see also* Ex. 1, ¶ 14; Ex. 2, ¶ 13. Similarly, Trimarco and Molina have never (and have never had) any ownership or other interest in or control over B Home. Ex. 1, ¶ 13; Ex. 2, ¶ 14; Ex. 3, ¶ 6. The FTC cannot dispute these facts, and cannot under any legal theory impose liability on Trimarco and Molina for alleged acts of B Home.

Moreover, the FTC's primary allegations are weak and proffered through the declarations of 13 cherry-picked former Home Assure customers, as well as two former Home Assure employees. The declarations of the 2 former employees are illustrative of, at best, the reckless lack of investigation by the FTC or, at worst, the knowing use of perjured testimony to support its *ex parte* request for extraordinary relief. The proof will show that both of these ex-employees lied in their declarations about, at a minimum, their termination for cause: one for showing up late and lying about it because he was arrested for possession of cocaine; the other for engaging in an illicit sexual acts at the Home Assure office with the already fired declarant. Ex. 3, ¶¶ 22, 23. The FTC's allegations of supposed deceptive practices are also belied by the hundreds of customers who accepted loan modifications and/or repayment plans with their lenders through the help of Home Assure, as well as the $283,655.99 Home Assure refunded its dissatisfied customers (including no less than 3 of the FTC's 13 cherry-picked customers). *Id.*, ¶ 6.

Ignoring these glaring facts, the FTC also ignores the fact that Home Assure was forced to close six (6) months ago because, among other reasons, it was not profitable and simply ran out of money. *Id.*, ¶¶ 28-30. During its operations, Home Assure was a financial failure. *Id.* From inception in 2007 through December 2008, Home Assure received $3,721,807.84 in gross

3

revenues. *See* Declaration of John Kubinec, ¶ 9, attached as Exhibit 5; Ex 3, ¶ 29. After subtracting costs of goods sold (including substantial marketing expenses), labor, and other legitimate business expenses, Home Assure's net income during the same period was <u>negative</u> $456.383.22. Ex. 3, ¶ 29; Ex. 5, ¶ 9.

Moreover, both Trimarco and Molina lost substantial sums in connection with Home Assure. Molina and Trimarco loaned $154,561.41[3] and $307,107.24[4] to Home Assure, respectively, that was never repaid. In September 2008, as a result of its poor financial condition, Home Assure was forced to wind-down its operations. Ex. 3, ¶¶ 30-31. By the end of October/early November 2008, Home Assure had stopped all meaningful operations. *Id.*

The facts are plain: Home Assure has been closed for some time; both Trimarco and Molina (as well as Home Assure) lost substantial sums; and there has been no showing much less the statutorily required "proper showing" that Trimarco or Molina are engaged in or are

---

[3] Molina loaned a total of $155,561.41 to Home Assure during its operations and wind-down, comprised of the following payments (and approximate payment dates): $3,793 (August 17, 2007); $29,957 (August 24, 2007); $46,000 (April 25, 2008); $20,000 (July 25, 2008); $20,000 (August 8, 2008); $35,500 (October 3, 2008); and $311.41 (November 21, 2008). Ex. 1, ¶¶ 10, 12-13. $35,811.41 of these loans were made <u>after</u> Molina resigned from Home Assure. *Id.* From about October 26, 2007 through September 5, 2008, Molina received a grand total of $83,607.68 in salary payments from Home Assure. *Id.* None of the $155,561.41 that Molina loaned Home Assure was ever repaid. *Id.*

[4] Trimarco loaned a total of $393,162.03 to Home Assure during its operations and wind-down, comprised of the following payments (and approximate payment dates): $1,850 (August 3, 2007); $31,900 (August 17, 2007); $30,000 (December 28, 2007); $10,000 (January 4, 2008); $15,000 (February 8, 2008); $5,000 (March 7, 2008); $5,000 (March 14, 2008); $10,000 (March 28, 2008); $45,000 (April 4, 2008); $55,000 (July 4, 2008); $90,000 (September 5, 2008); $35,500 (October 3, 2008); $52,000 (November 14, 2008); $6,912.03 (November 28, 2008). Ex. 2, ¶¶ 8, 10-11. $58,912.03 of these loans were made <u>after</u> Trimarco resigned from Home Assure in order to effectuate a proper wind down of the business. *Id.* From about October 26, 2007 through September 5, 2008, Trimarco received $69,304.42 in salary payments from Home Assure. *Id.* Only $86,054.79 of the approximate $393,000 Trimarco loaned Home Assure was ever repaid in the following amounts and dates: $20,500 (February 15, 2008); $5,000 (March 7, 2008); $5,000 (March 14, 2008); $5,000 (March 28, 2008); $5,000 (April 4, 2008); $45,554.79 (May 23, 2008). *Id.* However, these repayments were much less than what Trimarco initially loaned Home Assure (at the time of the last repayment, Home Assure still owed Trimarco approximately $67,695.21 in outstanding loans), and Trimarco made significant loans (approximately $239,412.03) <u>after</u> he received the last repayment. *Id.* Home Assure still owes Trimarco $307,107.24 in unpaid loans. Ex. 2, ¶¶ 8. 10-11.

HOMERBONNER
1200 Four Seasons Tower • 1441 Brickell Avenue • Miami, Florida 33131
Telephone: (305) 350-5100

substantially likely to engage in any violation of the FTC Act. However, the FTC ignores these salient facts, and now seeks preliminary injunctive relief against Trimarco and Molina. The FTC cannot possibly satisfy its burden to obtain this extraordinary relief, including the overbroad asset freeze. Accordingly, the FTC's motion for preliminary injunction should be denied in its entirety and the TRO should be immediately dissolved.

## ARGUMENT

### The Potential Gravity Of Injunctive Relief

As a threshold matter, it is important to emphasize something the FTC completely ignores and a fact that trial courts often overlook: the gravity of injunctive relief and the potential serious collateral consequences it may cause. Repeating former Chief Justice Burger's words, injunctive relief "is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith." *Aaron*, 446 U.S. 680, 703 (Burger, J., concurring).[5] Particularly important here is that Trimarco and Molina, who have not been affiliated with Home Assure for 7 and 8 months, respectively, must explore other business opportunities in order to provide for their respective families. If a preliminary injunction is entered against them, they may be statutorily disqualified from, among other things, serving on a board of directors or successfully registering with a virtual slew of regulatory agencies in connection with future employment. Moreover, the "taint" of such a preliminary injunction, which suggests that the Defendants have engaged in illicit activity, is not easily washed away and would irreparably harm their professional reputations – reputations that Defendants have spent a lifetime building.

---

[5] Courts have noted that, particularly in connection with federal agencies seeking injunctive relief under congressional acts, such as the Securities Exchange Act, the seriousness of permanent injunctions has triggered closer appellate scrutiny than was found in earlier decisions. *See SEC v. Blatt*, 583 F.2d 1325, 1344 (5th Cir. 1978); *see also SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980) (recognizing "the developing judicial attitude toward closer appellate scrutiny of the issuance of injunctions").

5

These collateral consequences may be severe, and must be taken into consideration by the Court. Defendants have acted in good faith since and certainly cooperated with the FTC since the TRO was entered on March 26, 2009. Specifically, Defendants immediately provided the FTC with copies of Home Assure's financial statements, quickbook information, and access to Home Assure's FATS database.[6] *See* Declaration of Peter W. Homer, ¶¶ 4-9, attached as Exhibit 6. As such, Defendants should only be subject to an injunction provided the FTC can satisfy its heavy burden for such relief – which the FTC cannot do.

### The FTC Must Carry Its Burden At The Preliminary Injunction Hearing

The April 6, 2009 hearing has been formally styled a supposed "show cause" hearing for Defendants, but there is no question that the FTC, at <u>all</u> times, has the burden of proving every required element of its preliminary injunction motion, as well as making the heightened showing for the asset freeze. The FTC relies upon 15 U.S.C. § 53(b) in support of its claim for injunctive relief. The section specifically provides that "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest … a preliminary injunction may be granted …" (emphasis added). The "proper showing" gives the FTC the burden of demonstrating both the likelihood of success and the weight of the equities is in favor of granting the injunction. *E.g. CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

Under <u>no</u> circumstances is there any burden shifting back to Defendants. *See Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) (remanding after finding the

---

[6] The FATS system is a hosted client relationship management tool and workflow process management system. It manages clients from first consultation through data entry, document generation, underwriting, mitigation, and closure. Home Assure representatives input into FATS all the customer's information, as well as all the agreements and correspondence with the various lending institutions. As the negotiations between Home Assure and the lender progressed, Home Assure representatives would upload notes on each customer file. Customers also had the unique ability to log-in and see the status of their accounts. Ex. 2, ¶ 5.n.1.

6

district court improperly shifted the burden to defendants as the burden "is at all times upon the plaintiff" to prove the elements of a preliminary injunction); *see also, e.g., S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1037, 1043 (2nd Cir. 1990) (finding the SEC must demonstrate the elements for a preliminary injunction, and modifying the freeze based on the SEC's meager showing); *S.E.C. v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978) (finding that "[t]o obtain injunctive relief the Commission must offer positive proof" to satisfy the elements for the relief requested).

Just as important is the requirement that the FTC meet its burden for the preliminary injunction at the preliminary injunction hearing.  Under *Levine v. Comcoa Ltd.*, 7 F. 3d 1191, 1192-93 (11th Cir. 1995) an *ex parte* temporary restraining order cannot, absent the consent of the defendant, be extended past the Rule 65 time limitations and, in no event, past the date of the preliminary injunction hearing (holding that a "TRO that is continued beyond the time permissible under Rule 65 should be treated as a preliminary injunction, which would be immediately appealable and reversible").  *Levine* specifically followed the U.S. Supreme Court's ruling in *Sampson v. Murray*, 415 U.S. 61, 87 (1974): "[w]here an adversary hearing has been held and the Court's basis for issuing the order strongly challenged, classification of the potentially unlimited order as a temporary restraining order seems particularly unjustified." Adopting this treatment, the *Levine* court concluded,

> [I]f the TRO had not become a preliminary injunction before, it became a preliminary injunction when the TRO, as orally extended by the District Court, went beyond the time permissible under Rule 65.  Thus, the proper course of conduct for [Defendant] Grossman was to treat the TRO as an erroneously granted preliminary injunction and to appeal.

*Levine*, 70 F.3d at 1193.   Key to this ruling is that the durational limits prescribed under Rule 65, Fed. R. Civ. P., control.  The U.S. Supreme Court has made clear that the Rule 65 limitations

7

presumptively apply to statutory injunctions, absent a clear indication in the statute otherwise. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70,* 415 U.S. 423, 94 S.Ct. 1113 (1974) (finding that a statute authorizing an injunction "can and should be interpreted in a manner which fully serves its underlying purposes, yet at the same time places it in harmony with the important congressional policies reflected in the time limitations in Rule 65(b)." *Id.* at 434 (emphasis added). The Court went on to explain the policies behind the durational limits of restraining orders:

> [W]e may note that although the durational limitations imposed on *ex parte* restraining orders are now codified in a federal rule, they had their origin in s 17 of the Clayton Act of 1914, 38 Stat. 737. As the House Report recommending its enactment emphasized, the durational and other limitations imposed on temporary restraining orders were thought necessary to cure a serious problem of 'ill-considered injunctions without notice.' The stringent restrictions imposed by s 17, and now by Rule 65, on the availability of *ex parte* temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. *Ex parte* temporary restraining orders . . . should be restricted to serving their underlying purpose of preserving the *status quo* and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.

*Id.* at 438-39 (emphasis added). *Granny Goose* thus commands that the Rule 65 limits apply, even to statutory restraining orders.

### Standard For Preliminary Injunction

In determining whether or not to issue an injunction, the Court must determine the likelihood that the FTC will ultimately succeed on the merits against these Defendants (not others) and then must balance the equities between the parties. *FTC v. University Health, Inc.,* 938 F.2d 1206, 1217 (11th Cir. 1991). As set forth in detail below, the FTC cannot succeed on the merits.

HOMERBONNER
1200 Four Seasons Tower • 1441 Brickell Avenue • Miami, Florida 33131
Telephone: (305) 350-5100

However, even if it could succeed on the merits (which it cannot), the FTC must also show there is a "cognizable danger of recurrent violation" or "some reasonable likelihood of future violations" for an injunction to issue. *FTC v. Netfran Dev. Corp.*, Case No. 05-22223-CIV-Ungaro-Benages (S.D. Fla. 2006), Ex. 7 hereto; *see also FTC v. Marketing Response Group, Inc.*, 1996 WL 420865, *2 (M.D. Fla. 1996) (explaining that a preliminary injunction is a drastic remedy and will only issue if the wrongs are ongoing or apt to continue) (citing *FTC v. Evans Products Co.*, 775 F. 2d. 1084, 1087 (9th Cir. 1985). Since it is not the role of equity to punish, an injunction should not be issued absent the requisite proof of a threat of future wrongdoing. *SEC v. Wills*, 472 F. Supp. 1250, 1275 (D.D.C. 1978) (holding that neither injunctive relief nor disgorgement were appropriate against corporate officers who allegedly violated provisions of Securities Exchange Act).

Indeed, 15 U.S.C. §53, the provision of the FTC Act authorizing injunctive relief first requires present or future violations of any provision of law enforced by the FTC. *See* 15 U.S.C. §53(b)(1) (allowing the FTC to seek preliminary injunctive relief only when any person . . . is violating, or is about to violate, any provision of law enforced by the FTC) (emphasis added). This provision differs from the injunctive relief provision under the Commodity Exchange Act ("CEA"), which expressly authorizes the Commodity Futures Trading Commission ("CFTC") to seek injunctive relief to address past, present, or future violations.[7]

---

[7] Section 6c of the CEA, 7 U.S.C. §13a-1 provides, in pertinent part:

> [w]henever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation or order thereunder, or is restraining trading in any commodity for future delivery, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this Act, or any rule, regulation or order thereunder.

(Emphasis added).

9

The FTC Act's exclusion of "past violations" can hardly be deemed unimportant. Indeed, if Congress had wanted to grant the FTC authority to seek injunctive relief for past violations of the Act (similar to the CEA), Congress knew how to do it. The FTC's authority cannot be implied or extrapolated. Rather, the statute must be applied as written. *See Dunn v. CFTC*, 519 U.S. 465, 470 (1997) (confirming that "[A]bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it). "Generally, a preliminary injunction under section 53(b) of the FTC Act will only issue if the wrongs are ongoing, or are apt to continue. An injunction is only authorized where a party is violating, or is about to violate, the law." *Marketing Response Group, Inc.*, 1996 WL 420865, *2 (internal citations omitted). Here, the FTC has focused solely on alleged past wrongdoing, rather than ongoing or future wrongdoing, which is not occurring nor is likely to occur.

While 15 U.S.C. § 53(b) is crystal clear that the FTC may only seek injunctive relief when there is reason to believe that any person is violating or about to violate any FTC law, the FTC clings to its argument that "[p]ast misconduct is 'highly suggestive of the likelihood of future violations,' where there is a pattern of misrepresentations as opposed to an isolated occurrence." *See* Pls. TRO Memo, at p.6 [D.E. #6] (citations omitted). Here, there is no "pattern of misrepresentation" on behalf of Defendants, nor is there any evidence of any misconduct.[8]

---

[8] The FTC claims that it is as a "pertinent fact" that Home Assure was subject to investigations by the state attorney generals of Florida, North Carolina and Minnesota, and that these investigations supposedly put Home Assure on notice of its alleged fraudulent actions and that it nevertheless continued to make fraudulent misrepresentations to consumers. This is wholly inaccurate. First, the Florida Attorney General did not find any wrongdoing by Home Assure and never even commenced an enforcement action against it. Second, the North Carolina and Minnesota attorney generals alleged that Home Assure had violated particular state statutes that prohibited companies from accepting pre-payment for lender assistance. Home Assure voluntarily resolved its dispute with both North Carolina and Minnesota, and voluntarily changed its business practices nationwide to provide lending plans before accepting any payment (even though many states, including Florida, did not at the time have analogous statutes). Ex 3, ¶ 4.n.1.

10

Even if there were, the mere fact of past violations is not enough to warrant injunctive relief. *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978). Rather, it is the FTC's burden to offer positive proof of the likelihood that the wrongdoing will recur. *Id.*

### The FTC Cannot Demonstrate it Will Ultimately Succeed on the Merits

A preliminary injunction is also not proper because the FTC cannot demonstrate it will ultimately succeed on the merits against these Defendants. The FTC erroneously claims that a preliminary injunction, including a complete freeze of the assets of Defendants, is necessary because Defendants have purportedly violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

In support of its allegations, the FTC paints a picture of Home Assure as a fly-by-night company that falsely claimed to "stop consumers' foreclosures in all or virtually all instances." (Compl. at 9, ¶34). This is unequivocally false. Home Assure diligently worked to obtain loan modifications on behalf of its customers. After an initial consultation, Home Assure would provide a loan modification and/or repayment plan to the customer for his/her review. Ex. 3, ¶ 4. The plan would provide the customer with a few suggested strategies (e.g., a forbearance plan) and assign a Home Assure mitigation representative to the file. *Id.* The plan would also request additional financial information from the customer, would walk the customer step-by-step through the general negotiation process with the lender, and would even offer some suggestions for an effective resolution. *Id.* The plan was provided to the customer <u>before</u> any payment was received by Home Assure. *Id.*

Once the customer received the plan, Home Assure would (i) assist the customer to prepare and deliver a hardship letter; (ii) gather all necessary customer documents (including all necessary financial documents); (iii) review the documents for accuracy and ensure they are

11

consistent with the plan; (iv) prepare and submit the complete plan to the lender; (v) engage in weekly follow-up calls and correspondence with the lender to ensure continuity; (vi) oversee the process to ensure the lender assigned the case and plan to one of its negotiators; and (vii) work to build a rapport with the negotiator. *Id.*, ¶ 5. All of this is done to persuade the lender accept the plan. *Id.*

Of note, after receiving the plan, the customer is under no obligation to accept the plan or have Home Assure implement the plan on their behalf. Ex. 3, ¶ 6. In fact, the customer is free to implement the plan directly with the lender if they so choose. *Id.* If the customer wants Home Assure to work on his/her behalf to negotiate the plan with the lender, the customer may retain Home Assure for a modest fee. *Id.*, ¶ 7. Once retained, Home Assure begins the negotiation process and works towards having the lender accept the plan. *Id.*, ¶ 8.

The FTC's attempt to paint Home Assure as some sort of foreclosure boiler room is belied by the actual statistics – information that the FTC can view from the FATS system that Defendants already provided them. Of the approximately 26,600 individuals who spoke to a Home Assure representative regarding the possibility of retaining Home Assure's lender assistance services, approximately 11,294 received some form of consultation. *Id.*, ¶ 11. That is, a Home Assure representative reviewed their file and financial information to discuss possible alternatives to resolving the individual's lending issues. Ex. 3, ¶ 11. Of those who received consultation, approximately 8,944 received ongoing lender assistance and advice with no fee whatsoever. *Id.*, ¶ 12. The remaining 2,350 formally retained Home Assure for lender assistance, and provided payment for Home Assure's services. *Id.*, ¶ 13.

Of the 2,350 customers who retained Home Assure, approximately 1,763 (<u>over 75%</u>) received a resolution from their lender. *Id.*, ¶ 14. That is, these individuals were provided with

12

some form of loan modification plan and/or workout from Home Assure, and the individual and their respective lender <u>accepted</u> the plan.  *Id.*  Moreover, about 257 (approximately 11%) of the customers who retained Home Assure were provided with some form of loan modification and/or workout from Home Assure, and the individual rejected the plan and denied the offer from the lender.  *Id.*, ¶ 15.  Approximately 190 (over 8%) customers who retained Home Assure received refunds totaling about $283,655.99.  Ex. 3, ¶ 16.  Many of the remaining customers decided to work directly with their lender or retain an attorney to advocate on their behalf.  *Id.*, ¶ 17.

Several of these costumers wrote to Home Assure to express their gratitude for the assistance the company provided.  *See* Composite Ex. 8, attached hereto.  For example, portions of the testimonials provide as follows:

- "The more I spoke with [Home Assure employee Jermaine Thompson], my fears went away . . .  I felt safe and I felt like this person really cares about me saving my home . . .  Home Assure should be proud that they have employees that really represent the name of the company Home Assure.  **Thank you Tiara and Jermaine for saving my home!**"  Alonza M. Lewis, October 12, 2007.  (Emphasis added).

- This letter i[s] to express our gratitude to the staff of Home Assure for their competent and compassionate service in helping us save our home.  Owning a home is one of life's greatest accomplishments.  And being faced with losing it is one of the most devastating and frightening experiences anyone can ever imagine.  **Home Assure helped us survive this ordeal and assisted us in obtaining the desired resolution – saving our home.**  Maria, February 27, 2008.  (Emphasis added).

- So, I really appreciate everything you were able to do to help me get into such an excellent position with my mortgage company and be able to keep my home.  I really was at the end of my options when I contacted your company.  It was a last-ditch effort because I thought I had done all I could do and that losing my home was a foregone conclusion.  **You guys performed a miracle for me.**  Thanks!  **I have and will continue to recommend your company to anyone that will stop long enough to listen.**  Thanks a million!  Michael B. Brown, May 7, 2008.  (Emphasis added).

13

- [Home Assure employees Chuck Ward and Penny Greene] were very professional during the whole ordeal, and what seemed overnight, had a solution to all our problems. I am not usually the type of person that gushes over the work of other people, but I have to say that they deserve any adulation that is given to them. They saved our home and provided my wife and me with the foundation to continue to raise our two children in a stable environment. **Thank you Home Assure, you were the answer to all our prayers.** Steve J., June 2008. (Emphasis added).

- Home Assure helped save our American dream! . . . With the economy and all of its uncertainties, it's nice to know we had somewhere to turn for a second chance and our dream lives on. Thank you Home Assure!!! Cliff Davis, March 31, 2008.

- If it wasn't for [Home Assure] we might [have] lost our mother's home. **If anyone out there is in need of help or just some advice on what to do with their loan, I would definitely recommend that you give Home Assure a chance.** They helped us keep our home and I know if you give them a shot they could help you as well. Joe Delgado, May 27, 2008. (Emphasis added).

*Id.* These testimonials are illustrative of the numerous satisfied Home Assure customers. Like any business, there are going to be some complaints. However, it is erroneous for the FTC to conclude that Home Assure did not provide the lending assistance services it advertised or that no customers benefited from Home Assure's services.

Nevertheless, to support its case, the FTC compiled 13 cherry-picked declarations from former customers who apparently were unsatisfied with their experience with Home Assure. *See* Pls. TRO Memo, at Ex. 4-16 [D.E. #6]. Based on these 13 declarations, the FTC wildly concludes that Defendants supposedly engaged in practices in violation of the FTC Act. While Defendants contest the unsworn, narrative portions of these declarations, these statements illustrate that Home Assure in-fact obtained loan repayment and modification plans for its customers, provided refunds to unsatisfied customers, and, in instances where a refund was not provided or a plan obtained, has understandable and justifiable explanations.

14

For example, two declarants, Aaron O'Conner and Ina Maria Neal, received 100% refunds, while Ann Sterling, another declarant, received a partial refund of $750. Ex. 3, ¶ 20. Some FTC declarants refused to accept refunds, such as Mauricio Givens, who (as alluded in his declaration) threatened to kill defendant Blanchard during his rejection of a refund. *Id.* Some FTC declarants, such as Thomas Cooper and Jeanette Spencer, were provided with a plan that was accepted by their lender, but the customers rejected that plan. *Id.* For example, Mr. Cooper demanded a loan modification, but was denied because he could not prove his income. *Id.* Home Assure then obtained a modification plan for him that was accepted by his lender, but Mr. Cooper refused (unreasonably, considering his inability to demonstrate any income). *Id.* Home Assure also helped Ms. Spencer obtain a special forbearance. *Id.* She claimed she could not afford the plan and demanded a refund, but Home Assure subsequently learned (from the lender no less) that Ms. Spencer did, in fact, execute the plan obtained by Home Assure. Ex. 3 ¶ 20.

Some of the FTC declarants also provided inaccurate, incomplete, or simply false financial information, which ultimately caused the lender to reject any plan. *Id.*, ¶ 21. For instance, Denis Schalow provided inaccurate financial forms, and the lender subsequently refused to provide any loan modification. *Id.* Similarly, declarant Shelia Stephens had a VA loan with her lender, which requires the homeowners to live in the home. *Id.* Ms. Stephens initially said she lived in the home, but it was later revealed that she was divorced and it was her husband – and not Ms. Stephens – who was living in the house. *Id.* Ms. Stephens' credit report also contained many more debts than initially disclosed. *Id.* Ms. Stephens changed her facts as they suited her, and she was not entitled to any refund. Ex. 3, ¶ 21. Unfortunately, the residential real-estate market has spiraled into an environment where homeowners routinely expect to receive substantial concessions on their mortgage difficulties, while, at the same time,

15

lenders are refusing to negotiate even basic loan modifications. *Id.* Many of Home Assure's supposedly unsatisfied customers (which number <u>far</u> less than the FTC asserts), are a product of this environment, which has only gotten worse since Home Assure ceased operating. *Id.*

Additionally, the FTC relies on the testimony of two former Home Assure employees, Barbara Hamilton and Todd Bryan, both of whom have <u>no</u> credibility and an axe to grind against Home Assure. *See* Pls. TRO Memo, at Ex. 2-3 [D.E. #6]. Ms. Hamilton was an administrative assistant at Home Assure. She was terminated in late January 2008 for engaging in inappropriate sexual acts with declarant Todd Bryan at Home Assure's office. Ex. 3, ¶ 22. Subsequent to being fired, Ms. Hamilton filed a baseless retaliatory sexual discrimination lawsuit against Home Assure, and to date has not recovered a penny on her meritless claim. *Id.*

Mr. Bryan may be the one person with <u>less</u> credibility than Ms. Hamilton. Mr. Bryan claims in his declaration that he "resigned" from Home Assure. Pls. TRO Memo, at Ex. 3 [D.E. #6]. This is a complete fabrication. On January 30, 2008, Mr. Bryan was terminated from Home Assure when he arrived late to work and lied regarding his whereabouts. *Id.*, ¶ 23. Home Assure representatives soon thereafter discovered that Mr. Bryan had been arrested <u>that day</u> for cocaine possession. *Id.* Mr. Bryan was placed on probation for his drug charge. *Id.*

### <u>The FTC Cannot Demonstrate A Reasonable Likelihood of Future Violations</u>

It is undisputed that Home Assure is no longer operating. Indeed, Home Assure stopped operating six (6) months before the FTC initiated this action. The FTC cites to the existence of B Home – an unrelated, separate entity with no relationship whatsoever to Home Assure, Trimarco, or Molina – as supposed evidence that Home Assure will likely re-start operations. Other than pointing at B Home, the FTC offers <u>no</u> evidence to show any "cognizable danger"

16

that Home Assure (let alone Trimarco or Molina) will commit any future violations. This is simply not enough to satisfy the FTC's burden.

Moreover, after Home Assure ceased operations, the State of Florida enacted Fla. Stat. § 501.1377, which rendered the pre-payment of lender-related services illegal.[9] The FTC takes issue with Home Assure having collected up-front fees for the services they provided. However, after the enactment of Fla. Stat. § 501.1377, this past method of collecting fees up-front is now *per se* illegal in Florida. It is nonsensical to believe Defendants (or any reasonable person) would knowingly operate a business in Florida that is prohibited and would subject Defendants to substantial monetary fines. In fact, in the absence of any evidence to the contrary, it is reasonable to infer that Defendants would <u>not</u> engage in such activity.

### Restitution Under § 13(b) of the FTC Act, 15 U.S.C. § 53(b)

The FTC brought this action under § 13(b) of the FTC Act, 15 U.S.C. § 53(b), which states that "in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). Although this provision does not expressly provide for restitution, several courts, including the Eleventh Circuit, have concluded that § 13(b) of the FTC Act allows restitution or other ancillary <u>equitable</u> relief. *See CFTC v. Wilshire Inv. Management Corp.*, 531 F.3d 1339, 1344 (11th Cir. 2008). There are two distinguishable types of restitution, equitable restitution and legal restitution.

Equitable restitution allows a plaintiff to recover money or property in a defendant's possession that could "clearly be traced" to money or property "identified as belonging in good

---

[9] Fla. Stat. § 501.1377 was rendered effective on October 1, 2008. Pursuant to Fla. Stat. § 501.1377(7), "[a] person who violates any provision of this section commits an unfair and deceptive trade practice as defined in part II of this chapter. Violators are subject to the penalties and remedies provided in part II of this chapter, including a monetary penalty not to exceed $15,000 per violation."

HOMERBONNER
1200 Four Seasons Tower • 1441 Brickell Avenue • Miami, Florida 33131
Telephone: (305) 350-5100

conscience to the plaintiff." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). Legal restitution, on the other hand, is awarded when a plaintiff cannot assert title to or the right to possession of the particular property, but nevertheless has some basis for recovering for some benefit that the defendant wrongly received from the plaintiff. *Id.*

Since the availability of restitution under § 13(b) of the FTC Act derives from the District Court's equitable jurisdiction, it follows that the District Court may only award equitable restitution. *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 66-67 (2d Cir. 2006).

### Labeling The Remedy As "Consumer Redress" Does Not Alter
### The Basic Principle That Restitution Is Measured By The Defendant's Gain

In an attempt to circumvent the fact that any redress should be limited to any supposed "unjust gains" received by Defendants – the controlling standard in the Eleventh Circuit – the FTC has at the 11th hour conveniently tried to re-package its equitable restitution/disgorgement claim as one for "consumer redress." In seeking the remedy of "consumer redress," alleged relief that the FTC does not even mention it its complaint, the FTC primarily relies on two Northern District of Georgia cases for the unconvincing proposition that "the proper amount of restitution has been held to be the purchase price of the relevant product . . . less any refunds." The FTC then brazenly brushes off this Circuit's controlling case on the measure of damages for equitable restitution/disgorgement (*Wilshire*), claiming that the Eleventh Circuit purportedly did not explain what was meant by "amount wrongfully gained."[10] Contrary to the FTC's distortion, however, the *Wilshire* Court expressly <u>adopted</u> the standard detailed in *Verity*, which found it an abuse of discretion to award the full amount of customer losses rather than the defendant's unjust

---

[10] *Wilshire* was decided on June 26, 2008, nearly a month <u>after</u> *Nat'l Urological Group*, the District Court opinion upon which the FTC relies.

18

enrichment. Opposing counsel is intimately familiar with *Verity*, which is the controlling law in their home Circuit and is even cited in the FTC's brief.

In *Verity*, the Court found that the lower court erroneously measured the appropriate amount of restitution as "the full amount lost by consumers." *Id.* In examining the lower court's ruling, the *Verity* Court elaborated, "[l]abeling the remedy 'consumer redress' or 'disgorgement,' each a restitutionary remedy, does not alter the basic principle that <u>restitution is measured by the defendant's gain.</u>" *Id.* (emphasis added); *see also Perieira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005) (stating that "restitution is measured by a defendant's unjust gain, rather than by a plaintiff's loss"); *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 76-79 (3d Cir. 1993) (holding that an award of equitable restitution measured in the amount of customer losses is generally improper); Restatement (Third) of Restitution §2 (Discussion Draft 2000) ("Liability in restitution is based on and measured by the receipt of a benefit . . .").

Despite the FTC's claim that the undersigned is "grossly mischaracterizing the law" on this issue, the undersigned was both the trial and appellate counsel in *Wilshire* and fully understands its holding. Indeed, it is the FTC – not Defendants - that seeks to sandbag this Court with inapposite, obscure, and patently distinguishable cases. The FTC clearly does not agree with *Wilshire* or *Variety* and for good reason: those cases destroy the FTC's ability to maintain its overbroad and infinite asset freeze. However, *Wilshire* and *Variety* are unambiguous in their holdings – which control, and require that this Court completely lift the asset freeze as it applies to these Defendants.

### To The Extent A Preliminary Injunction Is Granted, The Asset Freeze Should Be Limited To The Purported Ill-Gotten Gains Received By Defendants

Here, there were <u>no</u> ill-gotten gains because Defendants were not even able to recoup the money they lent the company, even after receiving very modest distributions from Home Assure

19

in the form of salaries.  During its operations, Home Assure was a financial failure.  Ex. 3, ¶ 29.

From inception in 2007 through December 2008, Home Assure received $3,721,807.84 in gross

revenues.  *Id.*  After subtracting costs of goods sold (including substantial marketing expenses),

labor, and other legitimate business expenses, Home Assure's net income during the same period

was <u>negative</u> $456.383.22.  *Id.*  Moreover, both Trimarco and Molina lost substantial sums in

connection with Home Assure.  Molina loaned $154,561.41 to Home Assure that was never

repaid.[11]  Trimarco loaned $307,107.24 to Home Assure that was never repaid.[12]  In September

2008, as a result of its poor financial condition, Home Assure was forced to wind-down its

operations.  By the end of October/early November 2008, Home Assure had stopped all

meaningful operations.

## <u>CONCLUSION</u>

**WHEREFORE**, Defendants Michael Trimarco and Nicolas Molina, respectfully request

that this Court enter an order denying the FTC's Motion for a Preliminary Injunction and Asset

Freeze with prejudice, and grant any and all such other relief as is necessary and just.

---

[11] *Supra* Note 3.

[12] *Supra* Note 4.

HOMERBONNER
1200 Four Seasons Tower • 1441 Brickell Avenue • Miami, Florida 33131
Telephone: (305) 350-5100

Respectfully submitted:

HOMERBONNER
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 350-5139
Telecopier: (305) 982-0063
Email: phomer@homerbonnerlaw.com

*Attorneys for Defendants Mike Trimarco and Nicolas Molina*

By: ___/s/ Peter W. Homer_____
           Peter W. Homer
           Florida Bar No: 291250

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served via this Court's CM/ECF electronic filing system on this 3rd day of April, 2009, upon Ann F. Weintraub, Esq., attorney for Plaintiff, Federal Trade Commission, Northeast Regional Office, 1 Bowling Green, Suite 318, New York, New York 10004, Kenton Johnson, Robb Evans & Associates LLC, 11450 Sheldon Street, Sun Valley, California 91352-1121, Temporary Receiver for the Receivership Defendant, and via electronic mail to Michael Grieco and Brian Blanchard (service address currently unknown).

           s/ Peter W. Homer_____
           Peter W. Homer

\\MIA-SVR\DATA\Docs\Wdox\CF\41374\0006\00042407.DOC

21