UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

      Plaintiff,

v.                                   CASE NO.: 8:09-cv-547-T-23TBM

HOME ASSURE, LLC, et al.,

      Defendants.

_____/

## ORDER

The plaintiff (the "FTC") sues (Doc. 1) pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), (the "FTC Act") for alleged deceptive conduct in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and seeks a permanent injunction, rescission or reformation of contracts, restitution, disgorgement, and other equitable relief.  The FTC and the defendants Nicolas Molina ("Molina") and Michael Trimarco ("Trimarco") submit cross-motions (Docs. 155, 201) for summary judgment as to the FTC's claim against the defendants.[1]

In moving for summary judgment, the FTC argues (Doc. 155) that the "undisputed evidence" establishes that Home Assure, LLC, ("Home Assure") violated the FTC Act by engaging in a material misrepresentation likely to mislead a consumer to believe (1) that Home Assure would stop foreclosure "in all or virtually all instances" and (2) that Home Assure would refund Home Assure's fee "in all instances when foreclosure was not

_____

[1] Each of the defendants Brian Blanchard ("Blanchard") and Michael Grieco ("Grieco") stipulated (Docs. 140, 141) to permanent injunction.  Home Assure, LLC, fails to appear.

stopped." The FTC asserts that both Molina and Trimarco are liable for Home Assure's violation of the FTC Act because both Molina and Trimarco possessed (1) authority to control Home Assure and (2) some knowledge of Home Assure's wrongful conduct. The defendants oppose (Doc. 227) the motion and move (Doc. 201) for summary judgment on the basis (1) that the FTC fails to demonstrate that Home Assure violated the FTC Act, (2) that "the FTC Act does not provide for secondary forms of individual liability against [the] [d]efendants," and (3) that the FTC fails to show that either Molina or Trimarco possessed both authority to control Home Assure and knowledge of wrongful conduct.

## Background

The defendants Trimarco, Molina, Blanchard, and Grieco formed Home Assure in 2007.[2] Home Assure offered "services to people facing foreclosure on their homes,"[3] which services consisted of negotiating with a lender to help a homeowner avoid foreclosure.[4] Home Assure solicited business through a web site, www.homeassure.com, which described Home Assure as "the nation's leading [f]oreclosure [m]itigation [c]ompany."[5] To avoid foreclosure, the web site suggested (1) "restructuring," (2) "re[-]instatement," (3) refinancing, (4) selling the home,

---

[2] In the first four months of Home Assure's operating, Home Assure's articles of organization listed Trimarco and Molina as managing members. Home Assure later amended the articles to remove each defendant as a managing member. (Doc. 155, App. 27, Ex. A1; App. 27, Ex. A2)

[3] (Doc. 155, App. 17, Ex. A; App. 25; Doc. 38-3)

[4] (Doc. 217) (Doc. 155, App. 27, Ex. B)

[5] (Doc. 155, App. 27, Ex. B, Ex. C)

(5) conducting a "short sale," (6) transferring the "deed in lieu of foreclosure," or (7) bankruptcy.[6]  Home Assure reiterated to an inquiring homeowner that Home Assure was "the most trusted name in foreclosure assistance."[7]  Home Assure advertised (1) that Home Assure was "backed by over 30 years of foreclosure assistance experience," (2) that Home Assure had "existing relationships with most lenders," and (3) that Home Assure could "propose a resolution and negotiation with your lender on your behalf, usually within two weeks."

Home Assure employed individuals with experience in loss mitigation, collections, bankruptcy, real estate, and local government.[8]  Blanchard worked for three foreclosure assistance companies before joining Home Assure and had experience in foreclosure assistance.[9]  Blanchard supervised "[m]anagement [s]ales [o]perations" in Home Assure's Florida office, and Grieco managed both "day[-]to[-]day operations" and Home Assure's mitigation department.[10]  Trimarco and Molina each held forty percent of Home Assure's shares, with Molina serving as Home Assure's chief executive officer and

---

[6] (Doc. 155, App. 27, Ex. B)  The defendants describe (1) "restructuring" as "the lender['s] reduc[ing] the principal amount of the mortgage or interest rate or both," (2) "repayment/forbearance" as "the amount of arrearage . . . spread over the remaining months of the mortgage," (3) "short sale" as "the borrower['s] sell[ing] and remit[ing] the proceeds to the lender[] who agrees not to seek any deficiency," and (4) "deed in lieu of foreclosure" as "the borrower['s] deed[ing] the property to the lender and the lender['s] agree[ing] not to seek any deficiency."  (Doc. 217)  The web site describes (1) "reinstatement" as "pay[ing] your lender(s) all of your past due payments to bring your mortgage current" and (2) "refinanc[ing]" as "loans on mortgages that are in foreclosure if there is enough equity in your property available."  (Doc. 155, App. 27, Ex. B)

[7] (Doc. 155, App. 27, Ex. F)

[8] (Doc. 226, pp. 149-58)

[9] (Doc. 155, App. 18, pp. 11-12, 33-34)

[10] (Doc. 155, App. 16)

Trimarco serving as president.[11]  Home Assure's ownership agreement describes

Molina as "[r]esponsible for the overall marketing of Home Assure products and

services" and Trimarco as "[r]esponsible for the management and maintenance of the

tech-ops and financial processes . . . [m]arketing planning and support."[12]

Urging a homeowner facing foreclosure to act quickly, Home Assure stated that

"[w]e're so confident in the abilities of our trained personnel; we offer a money back

guarantee."[13]  The money-back guarantee applied to Home Assure's retainer fee, which

Home Assure described on the web site:

> Q: "How much do you charge to stop foreclosure?" A: "Our fees are
> based on your mortgage payment amount[] and the complexity and
> urgency of your situation . . . [w]e offer a money back guarantee if we
> cannot get you a work[-]out agreement with your lender(s) as long as
> no sale date has been set."

---

[11] Home Assure's web site describes Trimarco and Molina as the company's co-founders.  (Doc. 155, App. 17, at 67) (Doc. 155, App. 16, at 331; App. 16, Ex. A; App. 27, Ex. B)

[12] (Doc. 155, App. 16, Ex. A) Although Molina describes his role in Home Assure as "primarily to provide initial capital and ongoing financing," Molina also (1) assisted "in purchasing client leads for the company," (2) "contracted with outside firms to run and manage search engine campaigns for Home Assure," and (3) contacted Home Assure's sales representatives "to obtain feedback on the quality of the purchased client leads."  Trimarco provided "financing, tech-ops, and financial operations expertise" by "monitor[ing] the company's finances and communicat[ing] [with] Home Assure's operations team." Neither Molina nor Trimarco assisted with the mitigation process, the "day-to-day management of Home Assure or its employees," or homeowner refund requests.  As compensation for his services and expenses, Trimarco received $70,040.20.  Molina received salary payments totaling $83,607.68.  Trimarco and Molina each "loaned" Home Assure approximately $393,000.00 and $155,561.41, respectively, which loans Home Assure never repaid.  (Docs. 38-1, 38-2)  In 2008, both Trimarco and Molina resigned from Home Assure.  The FTC (1) disputes both Trimarco and Molina's statements that each "loaned" money to Home Assure and (2) states that "the company's financial records show that the bulk of Home Assure's funds spent following [Trimarco and Molina's] "resignations" went to pay off credit cards in Molina's and Trimarco's names."  (Doc. 155)

[13] (Doc. 155, App. 27, Ex. B, Ex. C)

The defendants assert that the "standard fee" was "the higher of $1,500 or one month's mortgage payment."[14]  The FTC asserts that Home Assure charged more than $1,500 "if the representative could get the customer to pay more."[15]  The web site stated that "if [Home Assure] [is] unable to negotiate a plan with your lender that improves your situation or gives you a viable strategy to avoid or stop foreclosure, [Home Assure] will refund 100% of your money...  No questions asked!"[16]  However, Home Assure provided the caveat that "[d]ue to the fact that the ultimate decision sits with your lender, [Home Assure] clearly cannot guarantee that your foreclosure will be stopped or avoided."[17]

---

[14] (Doc. 217, p. 3, n.4)

[15] (Doc. 155, App. 22)  A former Home Assure employee stated in his deposition (1) that Home Assure's fee "was $1,500 or up to one month's mortgage payment," (2) that "[s]ome of the sales reps tried to get as much money as they could out of every deal," and (3) that each sales representative received a ten percent commission on a sale of up to $1,500, and a forty percent commission on any amount over $1,500.

[16](Doc. 155, App. 27, Ex. B, Ex. C) The web site contained statements such as (1) "The single-most important factor in stopping foreclosure is SPEED" and (2) "Time is the most critical factor here. With every day that passes our options become limited or more complex.  Every day makes a difference. Don't hesitate another minute!"  After calling Home Assure, a homeowner could "just sit back and relax, knowing that your home is in good hands."

[17] (Doc. 161-1) Home Assure also encouraged some homeowners to negotiate with the lender directly:

> If you are only a payment or two behind and your lender has not hired an attorney to begin foreclosure proceedings [you] may be able to negotiate a work out agreement yourself.  If you are successful then you have saved yourself some funds [that] can be used to get caught up on your mortgage.

However, Home Assure stated that a homeowner should not "waste a lot of time on this" and stated that "[i]f you don't have something worked out within 1-2 weeks, then it's obvious that your lender is not serious about working things out with you directly."  At that point, a homeowner would "be better served by professional representation."

Home Assure offered a free consultation, during which Home Assure "reviewed the [homeowner]'s information" and "determined whether the [homeowner] qualified."[18] Initially, Home Assure charged each "qualified" homeowner a fee before providing the homeowner with a "formal plan."  However, the defendants assert that, in response to state legislation prohibiting payment before service, Home Assure "stopped accepting any pre-payments and would only accept payment after a loan modification plan was provided to the [homeowner]."[19]  The FTC characterizes the "plan" received by a homeowner both as a "standardized letter that 'recommended' one of the basic options generally available to consumers (such as a forbearance plan)" and as "form language" that recommended an "approved" or "preapproved" plan based on Home Assure's "hypothetical conversation" with the lender.  The letter provided (1) a "strategy for negotiating with your lender and getting a workout plan in place to save your home from foreclosure" and (2) two pages of "suggestions" for working directly with the lender.[20] Attached to the letter was an "enrollment form" for obtaining Home Assure's services. The homeowner signed a "working agreement" and paid Home Assure's fee (the evidence conflicts as to whether a homeowner signed a working agreement before paying Home Assure's fee).[21]

---

[18] (Doc. 217)

[19] (Doc. 38-3)

[20] (Doc. 155, App. 25, Ex. A)

[21] (Docs. 217, 201-1, 38-3; Doc. 155, App. 16; Docs. 174, 175, 176)

The working agreement states that Home Assure's fee "is earned at the point [a] solution is recommended regardless of outcome" and that "all claims for a refund must be made within ninety (90) says of enrollment."  The working agreement contains several exceptions that limited Home Assure's money-back guarantee, which exceptions state that Home Assure provides "NO REFUND" (1) if Home Assure "performs as hired and the information provided by [the] [h]omeowner is incorrect and/or insufficient, thus causing results not satisfactory;" (2) if the homeowner "seeks independently a solution which [Home Assure] has been hired to perform;" (3) if the homeowner "fails to provide [Home Assure] with all information and copies of documents requested;" (4) if the homeowner "fails to maintain constant communication with [Home Assure] including but not limited to responding to phone calls or written communications within twenty[-]four hours;" and (5) if the homeowner "chooses not to comply with the results of [Home Assure's] analysis."[22]  The working agreement states also that Home Assure agrees to act as the homeowner's agent "but in no way guarantees the success of its efforts to avoid loss of possession of the mortgag[or]'s home through a foreclosure . . . ."[23]

Over two thousand homeowners retained Home Assure.  The defendants assert (1) that, of the homeowners who retained Home Assure, approximately 190 each received a refund; (2) that Home Assure paid approximately $283,655.99 in refunds; and (3) that approximately 1,763 of Home Assure's customers ("over 75%") received a

---

[22] (Doc. 155, App. 21, Ex. K)

[23] (Doc. 155, App. 27, Ex. F; App. 21, Ex. K)

- 7 -

"resolution" from the lender.[24]   However, the FTC asserts that Home Assure "failed to

perform as promised" because many homeowners received neither a viable plan after

paying Home Assure nor a refund of Home Assure's fee.[25]   As support, the FTC

provides the declarations of nineteen former Home Assure customers (at least six of

whom "ended up losing their homes and/or filing for bankruptcy") and over sixty

complaints by customers to Better Business Bureaus.  The defendants contest

(Doc. 221) each of the nineteen declarations and state that "[a]lmost all declarants

either received a plan, violated the terms of their [w]orking [a]greements, received a

refund, or sometimes both received a refund and violated their [w]orking

[a]greements."[26]   The defendants' rest each assertion upon an affidavit submitted by

Grieco,[27] which affidavit compares each declaration to Home Assure's record (contained

in Home Assure's "foreclosure assistance tracking system") for each customer.

Discussion

"To establish liability under section 5 of the FTC[] [Act], the FTC must establish

that (1) there was a representation[,] (2) the representation was likely to mislead

customers acting reasonably under the circumstances, and (3) the representation was

material."  F.T.C. v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003).  "A representation

is material if it is of a kind usually relied upon by a reasonably prudent person."  F.T.C.

---

[24] (Doc. 155, App. 25; Doc. 38-3)

[25] (Doc. 155)

[26] (Doc. 217) (emphasis omitted)

[27] (Doc. 221)

v. Transnet Wireless Corp., 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007).  "[W]hether a

representation is likely to mislead reasonable consumers must be determined 'by

viewing [the representation] as a whole, without emphasizing isolated words or phrases

apart from their context.'"  F.T.C. v. Peoples Credit First, LLC, 2005 WL 3468588, *6

(M.D. Fla. 2005) (quoting Removatron Intern. Corp. v. F.T.C., 884 F.2d 1489, 1496 (1st

Cir. 1989)).  If either an express claim or a deliberate, implied claim induces the

purchase of a particular product or service, the claim is presumptively material.

Transnet Wireless, 506 F. Supp. 2d at 1267.  An individual defendant faces liability for a

corporation's violating the FTC Act if the FTC establishes (1) that the defendant

"'participated directly in the practices or acts or had authority to control them'" and

(2) that the defendant "'had some knowledge of the [corporation's] practices.'"  F.T.C. v.

Gem Merchandising Corp., 87 F.3d 466, 470 (11th Cir. 1996) (quoting F.T.C. v. Amy

Travel Serv., Inc., 875 F.2d 564, 573 (7th Cir. 1989)).

    In this action, the FTC argues that, based on Home Assure's representations, a

reasonable consumer would likely believe (1) that Home Assure would stop foreclosure

in "all or virtually all instances" and (2) that Home Assure would refund the fee "in all

instances when foreclosure was not stopped."  The FTC argues that the "net

impression" caused by Home Assure's representations was misleading, despite each

disclaimer contained in Home Assure's working agreement.  However, the defendants

argue (1) that Home Assure specifically disclaimed any guarantee of stopping

foreclosure (both on the web site and in the working agreement) and (2) that Home

Assure informed each customer (both on the web site and in the working agreement)

- 9 -

that Home Assure's money-back guarantee was conditional.  The defendants assert

that the consumer signed and initialed the five-page working agreement before retaining

Home Assure and paying Home Assure's fee, but the FTC asserts that Home Assure

typically mailed the working agreement to the consumer after collecting the fee.

Furthermore, the FTC asserts that the working agreement is so ambiguous as to render

some of the provisions "meaningless."  Although some evidence shows that Home

Assure disclaimed the ability to stop foreclosure, the FTC argues that Home Assure

created the "net impression" that Home Assure would either prevent a foreclosure or

provide a refund.  Based on the evidence presented by both parties, a genuine factual

dispute exists as to whether Home Assure engaged in a material misrepresentation

likely to mislead a consumer and violated the FTC Act, for which violation Trimarco and

Molina must answer.

Conclusion

Accordingly, both the FTC's motion (Doc. 155) for summary judgment and the

defendants' motion (Doc. 201) for summary judgment are **DENIED**.  The defendants'

"unopposed motion for a hearing" (Doc. 238) on the summary judgment motions is

**DENIED AS MOOT**.

ORDERED in Tampa, Florida, on April 29, 2010.

_____

**STEVEN D. MERRYDAY**
**UNITED STATES DISTRICT JUDGE**

- 10 -